1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9               **DISTRICT OF ALASKA**
10
11
12  **AMERICAN PRESIDENT LINES,**
    **LTD.,**                          )
13                                     )
          **Plaintiff,**               )      **3:10-cv-00183 JWS**
14                                     )
          **vs.**                      )      **ORDER AND OPINION**
15                                     )
    **INTERNATIONAL LONGSHORE**        )      **[Re: Motion at Docket 49]**
16  **& WAREHOUSE UNION, ALASKA**      )
    **LONGSHORE DIVISION, UNIT 60,**   )
17                                     )
          **Defendant.**              )
18  _____)
19
20                      **I.  MOTION PRESENTED**
21          At docket 49, defendant International Longshore and Warehouse Union, Alaska
22  Longshore Division, Unit 60 ("defendant" or "ILWU") moves pursuant to Federal Rule of
23  Civil Procedure 56 for summary judgment.  Plaintiff American President Lines, Ltd.
24  ("plaintiff" or "APL") opposes the motion at docket 55.  Defendant's reply is at docket 59.
25
26
27
28

1    In an order at docket 60, the court directed the parties to file supplemental
2    briefing out of concern that APL does not have standing.[1]  APL filed a supplemental
3    memorandum at docket 61, and ILWU filed a supplemental memorandum at docket 65.
4    Oral argument was not requested and would not assist the court.

5                                    **II.  BACKGROUND**

6    APL operates marine terminals in Alaska and ocean-going vessels that transport
7    cargo.  APL's primary port is in Dutch Harbor.  APL is part of a multi-employer
8    bargaining unit known as the Alaska Maritime Employers Association ("AMEA").  The
9    only other current member of the AMEA is Horizon Lines.  Prior to 2003, North Star
10   Terminal and Stevedore Company ("North Star") and Southeast Stevedoring Company
11   ("SES") were also part of the AMEA.

12   The ILWU is a labor union that represents all longshore workers in specified
13   Alaskan ports.  Unit 60 is a constituent unit of the ILWU that represents longshoremen
14   in the port of Seward.  The AMEA and the ILWU are parties to a collective bargaining
15   agreement known as the All-Alaska Longshore Agreement ("AALA").

16   APL enters into connecting carrier agreements ("CCA") with barge operators to
17   move APL's export product from smaller or more remote ports to Dutch Harbor.  APL
18   has a CCA with Samson Tug and Barge ("Samson"), pursuant to which Samson
19   unloads empty containers shipped from Seattle or Dutch Harbor, loads the containers
20   with APL's export product, and then transports the containers by barge from Seward to
21   Dutch Harbor.  Samson's employees are represented by the Marine Engineers'
22   Beneficial Association ("MEBA") union.

23   The AALA covers "[a]ll movement of cargo on vessels, or loading to and
24   discharging from vessels of any type and on docks or to and from railroad cars."[2]

25

26   _____

27   [1]The court questioned whether APL has Article III standing and also whether the
     jurisdictional requirements of 29 U.S.C. § 187(b) are met.  Doc. 60 at 5 n.22.

28   [2]Doc. 51-1 at 5.

1  Seward is identified in the agreement as an "ILWU Port."[3]  The AALA also contains a
2  work preservation clause, which states that the AMEA "hereby assures [the ILWU] that
3  it will use its best efforts and act in good faith in preserving as much as possible all of
4  the work covered by [the AALA] for the registered work force."[4]

5       Based on work performed in Seward by Samson between July 13 and August 4,
6  2006, the ILWU "time-carded" APL.  When APL rejected the time card submissions, the
7  ILWU filed a grievance and sought arbitration.  The ILWU claimed that APL, through its
8  CCA with Samson, had displaced ILWU workers with Samson's MEBA-represented
9  workers and thus violated the AALA.

10      Arbitration was held based on written submissions in September 2006.  The
11  Alaska Area Arbitrator issued an award in the ILWU's favor.  APL made "in-lieu-of"
12  payments with respect to the disputed work covered by the award and subsequently
13  appealed.  On appeal, the Coast Arbitrator remanded the case to the Alaska Area
14  Arbitrator for an evidentiary hearing.

15      An evidentiary hearing was held on June 8, 2008.  On November 16, 2008, the
16  Alaska Area Arbitrator issued a written award sustaining the ILWU's grievance.  The
17  award directed APL "to have the loading and discharge of APL containers and/or cargo
18  to and from Connecting carriers (Samson) performed by ILWU personnel in the Port of
19  Seward" and to "continue its practice of pay in-lieu-of claims" until the transition was
20  complete.[5]

21      APL continued to pay the "in-lieu-of" claims and appealed again.  APL maintained
22  that implementation of the award would require it to violate Section 8(e) of the Labor
23  Management Relations Act ("LMRA").  The Coast Arbitrator determined only that the
24  AALA required APL to assign the work in question to the ILWU, consistent with the

25  _____

26      [3]*Id.* at 11.

27      [4]*Id.* at 35.

28      [5]Doc. 51-9 at 8.

-3-

1    Alaska Area Arbitrator's award, "as a precondition to appealing his decision in the

2    case."[6]

3           APL filed an unfair labor practice charge with the National Labor Relations Board

4    ("NLRB").  The General Counsel's Division of Advice investigated and advised that

5    APL's allegations lacked merit.  The Division of Advice determined that APL had the

6    right to control the work in question and that the ILWU was seeking to preserve "fairly

7    claimable" work because ILWU members had previously performed the work for another

8    signatory to the AALA.  The Division of Advice therefore found that the grievance and

9    arbitration award were lawful.[7]  The NLRB Regional Office dismissed APL's charges,

10   and APL's appeal was denied.

11                              **III.  STANDARD OF REVIEW**

12          Summary judgment is appropriate where "there is no genuine dispute as to any

13   material fact and the movant is entitled to judgment as a matter of law."[8]  The materiality

14   requirement ensures that "only disputes over facts that might affect the outcome of the

15   suit under the governing law will properly preclude the entry of summary judgment."[9]

16   Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable

17   jury could return a verdict for the nonmoving party."[10]  In resolving a motion for summary

18   judgment, a court must view the evidence in the light most favorable to the non-moving

19

20

21

22

23   ───────────────

24          [6]Doc. 51-10 at 6.

25          [7]Doc. 53 at 11, 12.

26          [8]Fed. R. Civ. P. 56(a).

27          [9]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

28          [10]*Id.*

1   party.[11]   The reviewing court may not weigh evidence or assess the credibility of
2   witnesses.[12]   The burden of persuasion is on the moving party.[13]

3                                       **IV.  DISCUSSION**

4   **A. The Nature of APL's Claim**

5            Section 303(b) of the Labor Management Relations Act ("LMRA") permits an
6   employer to sue for damages in federal court for any unfair labor practice defined in
7   § 8(b)(4) of the National Labor Relations Act ("NLRA").[14]   Section 8(b)(4) provides that it
8   is an unfair labor practice "to threaten, coerce, or restrain any person engaged in
9   commerce or in an industry affecting commerce, where . . . an object thereof is"[15] either
10  "forcing or requiring any employer . . . to enter into any agreement which is prohibited by
11  [§ 8(e) of the NLRA]"[16] or "forcing or requiring any person . . . to cease doing business
12  with any other person."[17]   Section 8(e) of the NLRA prohibits agreements between "any
13  labor organization and any employer . . . to cease doing business with any other
14  person."[18]

15           By contrast, § 301 of the LMRA provides federal jurisdiction in "[s]uits for violation
16  of contracts between an employer and a labor organization."[19]   Section 301 "can be

---

17
18

19           [11]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).
20
             [12]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).
21
22           [13]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
23           [14]29 U.S.C. § 187.
24           [15]*Id.* § 158(b)(4)(ii).
25
             [16]*Id.* § 158(b)(4)(ii)(A).
26
             [17]*Id.* § 158(b)(4)(ii)(B).
27
             [18]*Id.* § 158(e).
28
             [19]*Id.* § 185(a), (c).

1   used as a basis for federal question jurisdiction over actions to compel arbitration, as

2   well as petitions to confirm or vacate arbitration awards."[20]

3        APL argues that ILWU committed unfair labor practices under § 8(b)(4)(ii)(A) by

4   pursuing the grievance and obtaining through arbitration an interpretation of the AALA

5   that violated § 8(e) because 1) it required APL to cease doing business with Samson

6   and 2) that interpretation "permits subcontracting to companies who are signatories to

7   union contracts, but who are not current members of the AMEA multi-employer

8   bargaining unit."[21]  APL also argues that ILWU committed an unfair labor practice under

9   § 8(b)(4)(ii)(B) by pursuing the grievance and arbitration with the intent to force APL to

10  cease doing business with Samson.

11  **B. Article III Standing**

12       There are three elements that must be met to demonstrate Article III standing.

13  "First, the plaintiff must have suffered an 'injury in fact'–an invasion of a legally

14  protected interest which is (a) concrete and particularized, and (b) actual or imminent,

15  not conjectural or hypothetical."[22]  Second, the injury must be "fairly traceable to the

16  challenged action of the defendant, and not the result of the independent action of some

17  third party not before the court."[23]  Finally, "it must be likely . . . that the injury will be

18  redressed by a favorable decision."[24]  "The party invoking federal jurisdiction bears the

19  burden of establishing these elements."[25]

20

21

---

22       [20]*Carter v. Health Net of Cal.*, 374 F.3d 830, 835 (9th Cir. 2004).

23       [21]Doc. 1 ¶ 14.

24       [22]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and
25  quotations omitted).

26       [23]*Id.* (internal quotations omitted).

27       [24]*Id.* (internal quotations omitted).

28       [25]*Id.* at 561.

1    APL maintains that payment of the "in-lieu-of time" cards constitutes concrete

2    injury, fairly traceable to ILWU's pursuit of its grievance through arbitration, and that a

3    damages award will redress the injury.  The court concludes that APL has satisfied its

4    burden to demonstrate Article III standing.

5    **C. § 303 Standing**

6        Under § 303(b), "[w]hoever shall be injured in his business or property by reason

7    [of] any violation of [§ 8(b)(4) of the NLRA] may sue therefor in any district court of the

8    United States."[26]  Section 303(b) imposes greater standing limitations than Article III.[27]

9    In the context of Article III, APL has demonstrated sufficient injury-in-fact through

10   payment of the "in-lieu-of" time cards.  The question under § 303(b) is whether payment

11   of those time cards constituted injury "by reason [of]" a violation of § 8(b)(4).[28]

12       APL correctly maintains that pursuing a grievance through arbitration can

13   constitute an unfair labor practice under § 8(b)(4)(ii)(B).  APL cites *Local 32B-32J, Serv.*

14   *Emps. Int'l Union v. NLRB*,[29] and equates the facts in that case to those here.  Even

15   though pursuit of arbitration with an unlawful secondary objective can violate

16   § 8(b)(4)(ii)(B), there are critical procedural differences between the situation in *Local*

17   *32B* and the posture in this case.

18       In *Local 32B*, the employer filed an unfair labor practice charge immediately after

19   SEIU filed its demand for arbitration.  Once the Regional Director issued a complaint,

20   arbitration proceedings in that case were suspended.  The Administrative Law Judge

21   ("ALJ") found that SEIU's grievance violated § 8(b)(4)(ii)(B) because SEIU demanded

22   arbitration even though "the work in question had never been done by members of the

23

24   _____

25       [26]29 U.S.C. § 187(b).

26       [27]*Fulton v. Plumbers & Steamfitters*, 695 F.2d 402, 405, 408 (9th Cir. 1982).

27       [28]*See* 29 U.S.C. § 187(b).

28       [29]68 F.3d 490 (D.C. Cir. 1995).

1  bargaining unit and therefore was not fairly claimable."[30]  Critically, it was "undisputed
2  that [the employer had] always used outside, independent contractors" to perform the
3  work in question.[31]  SEIU appealed the ALJ's decision, and the NLRB affirmed.  SEIU
4  then petitioned for review of the NLRB's decision in the D.C. Circuit.

5          Here, arbitration was held (twice) and appealed both times after the arbitrator
6  found in favor of ILWU on that precise issue.  The arbitrator determined that ILWU had
7  performed the Seward work and, moreover, that the APL had control over the work
8  performed by Samson.  The General Counsel's Division of Advice also determined that
9  ILWU's conduct was lawful, the Regional Office dismissed APL's charges, and APL's
10  appeal was also dismissed.  Both the Alaska Area Arbitrator and the General Counsel's
11  Division of Advice determined that the Seward work was fairly claimable by ILWU.
12  Therefore, although *Local 32B* clearly held that pursuit of a grievance with an unlawful
13  secondary objective can constitute coercive conduct under § 8(b)(4)(ii)(B), that case
14  does not speak to the situation here, where two reviewing entities have determined that
15  ILWU's grievance was not pursued with an unlawful secondary objective.

16          APL cites *Charvet v. International Longshoremen's Assoc.*[32] in support of its
17  argument that it has standing to proceed under § 303.  That case too, however, involved
18  a boycott that "was later found to be an illegal secondary boycott under section
19  8(b)(4)."[33]  In discussing standing under § 303, the Court of Appeals for the District of
20  Columbia Circuit recognized that "[t]here is some authority for the proposition that even
21  the *employees* of a primary employer may be permitted to recover damages under

22
23
24  ───────────────
25  [30]*Id.* at 493.
26  [31]*Id.* at 494.
27  [32]736 F.2d 1572 (D.C. Cir. 1984).
28  [33]*Id.* at 1574.

1   § 303, at least when the employees are found to be the direct object *of a secondary*

2   *boycott.*"[34] That is far from APL's situation here.

3       There is a national labor policy in favor of arbitration.[35]  The AALA provides that

4   "[t]he grievance procedure of this Agreement shall be the *exclusive remedy* with respect

5   to *any disputes* arising between [ILWU] . . . and any Employer acting under the

6   Agreement . . . and *no other remedies shall be utilized* . . . with respect to any dispute

7   involving this Agreement until the grievance procedure has been exhausted."[36]  The

8   grievance procedure calls for arbitration.[37]  The parties vested the arbitrator with the

9   authority to interpret the agreement and "jurisdiction to decide any and all disputes

10  arising under the Agreement."[38]  The AALA states that "[a]ll decisions of the arbitrator

11  shall be final and binding upon all parties."[39]

12      Here, the arbitrator determined that the loading and unloading of containers at

13  Seward was bargaining unit work that had traditionally been performed by ILWU and

14  that APL had control of the work performed by Samson.  The arbitrator therefore

15  determined that ILWU did not violate § 8(b)(4).  Because that determination is binding

16  on APL, there is no basis for APL to assert a claim under § 303.

17      APL is attempting to litigate issues–whether the Seward work was fairly claimable

18  by ILWU and whether APL had a right to control that work–that have already been

19  decided through arbitration which the parties agreed would be binding.  The proper

20  ────────────────────

21      [34]*Id.* at 1576–77 (second emphasis added).

22      [35]*See United Steelworkers of Am. v. Retirement Income Plan*, 512 F.3d 555, 559 (9th
23  Cir. 2008) (citing *United Steelworkers of Am. v. Am. Manufacturing Co.*, 363 U.S. 564 (1960);
    *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United*
24  *Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960)).

25      [36]Doc. 51-1 at 39 (emphasis added).

26      [37]*Id.* at 40–41.

27      [38]*Id.* at 41.

28      [39]*Id.*

1  procedure would have been for APL to challenge the award via a petition to vacate
2  under § 301.  Allowing APL to proceed under § 303 would undermine the national labor
3  policy in favor of arbitration.

4  **V.  CONCLUSION**

5       For the foregoing reasons, APL's claim is **DISMISSED** for lack of standing to
6  proceed under § 303(b) of the Labor Management Relations Act.

7       DATED this 5th day of December 2011.

                                        _____
                                                   /s/
                                        JOHN W. SEDWICK
                                        UNITED STATES DISTRICT JUDGE

-10-