UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

AMERICAN PRESIDENT LINES, LTD.,

    Plaintiff,

vs.

INTERNATIONAL LONGSHORE & WAREHOUSE UNION, ALASKA LONGSHORE DIVISION, UNIT 60,

    Defendant.

3:10-cv-00183 JWS

ORDER AND OPINION

[Re: Motion at Docket 49]

## I. MOTION PRESENTED

At docket 49, defendant International Longshore and Warehouse Union, Alaska Longshore Division, Unit 60 ("defendant" or "ILWU") moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Plaintiff American President Lines, Ltd. ("plaintiff" or "APL") opposes the motion at docket 55. Defendant's reply is at docket 59.

In an order at docket 60, the court directed the parties to file supplemental briefing out of concern that APL does not have standing.[1] APL filed a supplemental memorandum at docket 61, and ILWU filed a supplemental memorandum at docket 65. Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

APL operates marine terminals in Alaska and ocean-going vessels that transport cargo. APL's primary port is in Dutch Harbor. APL is part of a multi-employer bargaining unit known as the Alaska Maritime Employers Association ("AMEA"). The only other current member of the AMEA is Horizon Lines. Prior to 2003, North Star Terminal and Stevedore Company ("North Star") and Southeast Stevedoring Company ("SES") were also part of the AMEA.

The ILWU is a labor union that represents all longshore workers in specified Alaskan ports. Unit 60 is a constituent unit of the ILWU that represents longshoremen in the port of Seward. The AMEA and the ILWU are parties to a collective bargaining agreement known as the All-Alaska Longshore Agreement ("AALA").

APL enters into connecting carrier agreements ("CCA") with barge operators to move APL's export product from smaller or more remote ports to Dutch Harbor. APL has a CCA with Samson Tug and Barge ("Samson"), pursuant to which Samson unloads empty containers shipped from Seattle or Dutch Harbor, loads the containers with APL's export product, and then transports the containers by barge from Seward to Dutch Harbor. Samson's employees are represented by the Marine Engineers' Beneficial Association ("MEBA") union.

The AALA covers "[a]ll movement of cargo on vessels, or loading to and discharging from vessels of any type and on docks or to and from railroad cars."[2]

---

[1]The court questioned whether APL has Article III standing and also whether the jurisdictional requirements of 29 U.S.C. § 187(b) are met. Doc. 60 at 5 n.22.

[2]Doc. 51-1 at 5.

Seward is identified in the agreement as an "ILWU Port."[3]  The AALA also contains a work preservation clause, which states that the AMEA "hereby assures [the ILWU] that it will use its best efforts and act in good faith in preserving as much as possible all of the work covered by [the AALA] for the registered work force."[4]

Based on work performed in Seward by Samson between July 13 and August 4, 2006, the ILWU "time-carded" APL.  When APL rejected the time card submissions, the ILWU filed a grievance and sought arbitration.  The ILWU claimed that APL, through its CCA with Samson, had displaced ILWU workers with Samson's MEBA-represented workers and thus violated the AALA.

Arbitration was held based on written submissions in September 2006.  The Alaska Area Arbitrator issued an award in the ILWU's favor.  APL made "in-lieu-of" payments with respect to the disputed work covered by the award and subsequently appealed.  On appeal, the Coast Arbitrator remanded the case to the Alaska Area Arbitrator for an evidentiary hearing.

An evidentiary hearing was held on June 8, 2008.  On November 16, 2008, the Alaska Area Arbitrator issued a written award sustaining the ILWU's grievance.  The award directed APL "to have the loading and discharge of APL containers and/or cargo to and from Connecting carriers (Samson) performed by ILWU personnel in the Port of Seward" and to "continue its practice of pay in-lieu-of claims" until the transition was complete.[5]

APL continued to pay the "in-lieu-of" claims and appealed again.  APL maintained that implementation of the award would require it to violate Section 8(e) of the Labor Management Relations Act ("LMRA").  The Coast Arbitrator determined only that the AALA required APL to assign the work in question to the ILWU, consistent with the

---

[3]*Id.* at 11.

[4]*Id.* at 35.

[5]Doc. 51-9 at 8.

Alaska Area Arbitrator's award, "as a precondition to appealing his decision in the case."[6]

APL filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"). The General Counsel's Division of Advice investigated and advised that APL's allegations lacked merit. The Division of Advice determined that APL had the right to control the work in question and that the ILWU was seeking to preserve "fairly claimable" work because ILWU members had previously performed the work for another signatory to the AALA. The Division of Advice therefore found that the grievance and arbitration award were lawful.[7] The NLRB Regional Office dismissed APL's charges, and APL's appeal was denied.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[9] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[10] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving

---

[6] Doc. 51-10 at 6.

[7] Doc. 53 at 11, 12.

[8] Fed. R. Civ. P. 56(a).

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Id.*

party.[11] The reviewing court may not weigh evidence or assess the credibility of witnesses.[12] The burden of persuasion is on the moving party.[13]

### IV. DISCUSSION

**A. The Nature of APL's Claim**

Section 303(b) of the Labor Management Relations Act ("LMRA") permits an employer to sue for damages in federal court for any unfair labor practice defined in § 8(b)(4) of the National Labor Relations Act ("NLRA").[14] Section 8(b)(4) provides that it is an unfair labor practice "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is"[15] either "forcing or requiring any employer . . . to enter into any agreement which is prohibited by [§ 8(e) of the NLRA]"[16] or "forcing or requiring any person . . . to cease doing business with any other person."[17] Section 8(e) of the NLRA prohibits agreements between "any labor organization and any employer . . . to cease doing business with any other person."[18]

By contrast, § 301 of the LMRA provides federal jurisdiction in "[s]uits for violation of contracts between an employer and a labor organization."[19] Section 301 "can be

---

[11]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[12]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[13]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[14]29 U.S.C. § 187.

[15]*Id.* § 158(b)(4)(ii).

[16]*Id.* § 158(b)(4)(ii)(A).

[17]*Id.* § 158(b)(4)(ii)(B).

[18]*Id.* § 158(e).

[19]*Id.* § 185(a), (c).

used as a basis for federal question jurisdiction over actions to compel arbitration, as well as petitions to confirm or vacate arbitration awards."[20]

APL argues that ILWU committed unfair labor practices under § 8(b)(4)(ii)(A) by pursuing the grievance and obtaining through arbitration an interpretation of the AALA that violated § 8(e) because 1) it required APL to cease doing business with Samson and 2) that interpretation "permits subcontracting to companies who are signatories to union contracts, but who are not current members of the AMEA multi-employer bargaining unit."[21] APL also argues that ILWU committed an unfair labor practice under § 8(b)(4)(ii)(B) by pursuing the grievance and arbitration with the intent to force APL to cease doing business with Samson.

**B. Article III Standing**

There are three elements that must be met to demonstrate Article III standing. "First, the plaintiff must have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."[22] Second, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[23] Finally, "it must be likely . . . that the injury will be redressed by a favorable decision."[24] "The party invoking federal jurisdiction bears the burden of establishing these elements."[25]

---

[20]*Carter v. Health Net of Cal.*, 374 F.3d 830, 835 (9th Cir. 2004).

[21]Doc. 1 ¶ 14.

[22]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted).

[23]*Id.* (internal quotations omitted).

[24]*Id.* (internal quotations omitted).

[25]*Id.* at 561.

APL maintains that payment of the "in-lieu-of time" cards constitutes concrete injury, fairly traceable to ILWU's pursuit of its grievance through arbitration, and that a damages award will redress the injury. The court concludes that APL has satisfied its burden to demonstrate Article III standing.

**C. § 303 Standing**

Under § 303(b), "[w]hoever shall be injured in his business or property by reason [of] any violation of [§ 8(b)(4) of the NLRA] may sue therefor in any district court of the United States."[26] Section 303(b) imposes greater standing limitations than Article III.[27] In the context of Article III, APL has demonstrated sufficient injury-in-fact through payment of the "in-lieu-of" time cards. The question under § 303(b) is whether payment of those time cards constituted injury "by reason [of]" a violation of § 8(b)(4).[28]

APL correctly maintains that pursuing a grievance through arbitration can constitute an unfair labor practice under § 8(b)(4)(ii)(B). APL cites *Local 32B-32J, Serv. Emps. Int'l Union v. NLRB*,[29] and equates the facts in that case to those here. Even though pursuit of arbitration with an unlawful secondary objective can violate § 8(b)(4)(ii)(B), there are critical procedural differences between the situation in *Local 32B* and the posture in this case.

In *Local 32B*, the employer filed an unfair labor practice charge immediately after SEIU filed its demand for arbitration. Once the Regional Director issued a complaint, arbitration proceedings in that case were suspended. The Administrative Law Judge ("ALJ") found that SEIU's grievance violated § 8(b)(4)(ii)(B) because SEIU demanded arbitration even though "the work in question had never been done by members of the

---

[26] 29 U.S.C. § 187(b).

[27] *Fulton v. Plumbers & Steamfitters*, 695 F.2d 402, 405, 408 (9th Cir. 1982).

[28] *See* 29 U.S.C. § 187(b).

[29] 68 F.3d 490 (D.C. Cir. 1995).

bargaining unit and therefore was not fairly claimable."[30]  Critically, it was "undisputed that [the employer had] always used outside, independent contractors" to perform the work in question.[31]  SEIU appealed the ALJ's decision, and the NLRB affirmed.  SEIU then petitioned for review of the NLRB's decision in the D.C. Circuit.

Here, arbitration was held (twice) and appealed both times after the arbitrator found in favor of ILWU on that precise issue.  The arbitrator determined that ILWU had performed the Seward work and, moreover, that the APL had control over the work performed by Samson.  The General Counsel's Division of Advice also determined that ILWU's conduct was lawful, the Regional Office dismissed APL's charges, and APL's appeal was also dismissed.  Both the Alaska Area Arbitrator and the General Counsel's Division of Advice determined that the Seward work was fairly claimable by ILWU.  Therefore, although *Local 32B* clearly held that pursuit of a grievance with an unlawful secondary objective can constitute coercive conduct under § 8(b)(4)(ii)(B), that case does not speak to the situation here, where two reviewing entities have determined that ILWU's grievance was not pursued with an unlawful secondary objective.

APL cites *Charvet v. International Longshoremen's Assoc.*[32] in support of its argument that it has standing to proceed under § 303.  That case too, however, involved a boycott that "was later found to be an illegal secondary boycott under section 8(b)(4)."[33]  In discussing standing under § 303, the Court of Appeals for the District of Columbia Circuit recognized that "[t]here is some authority for the proposition that even the *employees* of a primary employer may be permitted to recover damages under

---

[30]*Id.* at 493.

[31]*Id.* at 494.

[32]736 F.2d 1572 (D.C. Cir. 1984).

[33]*Id.* at 1574.

-8-

§ 303, at least when the employees are found to be the direct object *of a secondary boycott.*"[34] That is far from APL's situation here.

There is a national labor policy in favor of arbitration.[35] The AALA provides that "[t]he grievance procedure of this Agreement shall be the *exclusive remedy* with respect to *any disputes* arising between [ILWU] . . . and any Employer acting under the Agreement . . . and *no other remedies shall be utilized* . . . with respect to any dispute involving this Agreement until the grievance procedure has been exhausted."[36] The grievance procedure calls for arbitration.[37] The parties vested the arbitrator with the authority to interpret the agreement and "jurisdiction to decide any and all disputes arising under the Agreement."[38] The AALA states that "[a]ll decisions of the arbitrator shall be final and binding upon all parties."[39]

Here, the arbitrator determined that the loading and unloading of containers at Seward was bargaining unit work that had traditionally been performed by ILWU and that APL had control of the work performed by Samson. The arbitrator therefore determined that ILWU did not violate § 8(b)(4). Because that determination is binding on APL, there is no basis for APL to assert a claim under § 303.

APL is attempting to litigate issues–whether the Seward work was fairly claimable by ILWU and whether APL had a right to control that work–that have already been decided through arbitration which the parties agreed would be binding. The proper

---

[34]*Id.* at 1576–77 (second emphasis added).

[35]*See United Steelworkers of Am. v. Retirement Income Plan*, 512 F.3d 555, 559 (9th Cir. 2008) (citing *United Steelworkers of Am. v. Am. Manufacturing Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960)).

[36]Doc. 51-1 at 39 (emphasis added).

[37]*Id.* at 40–41.

[38]*Id.* at 41.

[39]*Id.*

procedure would have been for APL to challenge the award via a petition to vacate under § 301. Allowing APL to proceed under § 303 would undermine the national labor policy in favor of arbitration.

## V.  CONCLUSION

For the foregoing reasons, APL's claim is **DISMISSED** for lack of standing to proceed under § 303(b) of the Labor Management Relations Act.

DATED this 5th day of December 2011.



/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE