UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

AMERICAN PRESIDENT LINES, LTD.,   )
      Plaintiff,   )     3:10-CV-00183 JWS
      vs.   )     ORDER AND OPINION
INTERNATIONAL LONGSHORE AND   )     [Re: Motion at docket 88]
WAREHOUSE UNION, ALASKA   )
LONGSHORE DIVISION, UNIT 60,   )
      Defendant.   )

## I.  MOTION PRESENTED

At docket 88, defendant International Longshore and Warehouse Union, Alaska Longshore Division, Unit 60 ("Defendant" or "ILWU") moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment.  Plaintiff American President Lines, Ltd. ("Plaintiff" or "APL") opposes the motion at docket 94.  Defendant's reply is at docket 100.  Neither party requested oral argument, and it would not be of assistance to the court.

## II.  BACKGROUND

APL operates marine terminals in Alaska and ocean-going vessels that transport cargo.  APL's primary port is in Dutch Harbor.  APL is part of a multi-employer bargaining unit known as the Alaska Maritime Employers Association ("AMEA").  The only other current member of the AMEA is Horizon Lines.  Prior to 2003, North Star Terminal and Stevedore Company ("North Star") and Southeast Stevedoring Company ("SES") were also part of the AMEA.

-1-

The ILWU is a labor union that represents all longshore workers in specified Alaska ports, including the Port of Seward. Unit 60 is a constituent unit of the ILWU that represents longshoremen in the port of Seward.

The AMEA and the ILWU are parties to a collective bargaining agreement known as the All-Alaska Longshore Agreement ("AALA"). North Star and SES are also parties to the AALA: prior to 2003 they were parties through their affiliation with AMEA and after 2003 they were individual signatory employers.

The AALA covers "[a]ll movement of cargo on vessels, or loading to and discharging from vessels of any type and on docks or to and from railroad cars."[1] Seward is identified in the agreement as an "ILWU Port." The agreement also contains a work preservation provision, which states that the employer, which includes the AMEA and the individual signatory employers, "hereby assures [the ILWU] that it will use its best efforts to act in good faith in preserving as much as possible all of the work covered by [the AALA] for the registered work force."[2]

APL's large vessels cannot access many of Alaska's smaller ports, including the port in Seward. As a result, APL enters into connecting carrier agreements ("CCA") with barge operators to move APL's export product from these smaller ports to Dutch Harbor. APL has a CCA with Samson Tug and Barge ("Samson"), pursuant to which Samson uses its barges to transport APL's shipping containers between Dutch Harbor and Seward. At Dutch Harbor, APL uses ILWU labor to load its empty containers onto Samson's barges. Once in Seward, Samson employees unload the empty containers on the docks for APL customers to fill with their export products, and then Samson employees reload filled containers on the barges to be transported back to Dutch Harbor. ILWU employees unload the containers from Samson's barges once they are back in Dutch Harbor.

---

[1]Doc. 91 at p. 15 (Ex. A at p. 4); Doc. 96-1 at p. 5.

[2]Doc. 91 at p. 45 (Ex. A at p. 34); Doc. 96-1 at p. 36.

Samson is not a member of AMEA, nor is it an individual party to the AALA. It does not employ ILWU labor in Seward but, rather, has its own workforce there. Its employees are represented by the Marine Engineers' Beneficial Association ("MEBA") union. For some period of time prior to 2003, before it had its own workforce in Seward, Samson used North Star as a contractor to perform cargo handling in Seward. North Star, at that time a member of the AMEA and at all times a party to the AALA, used ILWU labor for that work. APL has never had any cargo-handling operations or employees of its own in Seward, and it is undisputed that ILWU labor never directly performed any cargo-handling operations for APL in Seward.[3]

In August of 2006, the ILWU filed a grievance against APL for APL's use of non-ILWU employees to offload APL containers in Seward and sought arbitration. The ILWU claimed that APL, through its CCA with Samson, had displaced ILWU workers in Seward with Samson's MEBA-represented workers in violation of the AALA's work preservation provision.

Arbitration was held based on written submissions in September 2006. The Alaska Arbitrator issued an award in the ILWU's favor, concluding that the AALA's work preservation provision required that APL assign the disputed work in Seward to the ILWU.[4] Specifically, the Alaska Arbitrator found that the disputed loading work was previously done by the ILWU, and he found that APL controls who handles its cargo. He ordered APL to assign the work to the ILWU. APL made "in-lieu-of" payments with respect to the disputed work covered by the award and appealed. On appeal, the Coast Arbitrator remanded the case to the Alaska Arbitrator for a full evidentiary hearing.[5]

---

[3]It is disputed whether ILWU indirectly performed cargo-handling work for APL: the parties disagree as to whether Samson was transporting APL cargo when it contracted with North Star for cargo handling operations in Seward.

[4]Doc. 91 at pp. 111-120 (Ex. B).

[5]Doc. 91 at pp. 122-127 (Ex. C).

-3-

In the fall of 2008, after a full hearing, the Alaska Arbitrator concluded that there was no compelling evidence presented that would modify or change his original arbitration decision that the AALA required APL to assign its cargo-handling work in Seward to the ILWU.[6]  In a written decision, the Alaska Arbitrator found that ILWU workers had performed cargo-handling work in Seward through North Star, a signatory to the AALA.[7]  As a result of these findings, the arbitrator ordered APL to assign the cargo-handling work to ILWU's Unit 60.  He also suggested ways in which APL could satisfy its obligation, but ultimately concluded that it was APL's decision as to how APL would comply.[8]

Rather than transition the work to the ILWU as ordered, APL continued to make "in-lieu-of" payments and appealed the renewed decision, arguing that implementation of the Alaska Arbitrator's award would require it to violate section 8(e) of the National Labor Relations Act ("NLRA").[9]  The Coast Arbitrator determined that "as a precondition to appealing his decision in the case," APL had to actually assign the work in question to the ILWU, consistent with the Alaska Arbitrator's award.[10]

APL filed an unfair labor practice charge with the National Labor Relations Board ("NLRB").  It alleged that the arbitrator's award violated section 8(e) of the NLRA and that the ILWU violated sections 8(b)(4)(ii)(A) and (B) of the NLRA[11] by pursuing an unlawful interpretation of the AALA.  The NLRB General Counsel's Division of Advice concluded that APL's allegations lacked merit because the ILWU's grievance and the

---

[6]Doc. 91 at p. 149 (Ex. G).

[7]Doc. 91 at pp. 155-56 (Ex. H at pp. 5-6).

[8]Doc. 91 at pp. 155-56, 157 (Ex. H at pp. 5-6, 7).

[9]29 U.S.C. § 158(e).

[10]Doc. 91 at pp.162-163 (Ex. I at pp. 4-5).

[11]29 U.S.C. § 158(b)(4)(ii)(A), (B).

-4-

resulting arbitration award were lawful.[12]  The NLRB Regional Office dismissed APL's charges,[13] and APL's appeal to the Central Office of Appeals was denied.[14]

APL then filed the current action under section 303 of the Labor Management Relations Act ("LMRA"),[15] which permits an employer to sue for damages in federal court for any unfair labor practice defined in section 8(b)(4) of the NLRA.  APL asserts in its complaint that the ILWU violated subsections 8(b)(4)(ii)(A) and (B) when it advanced an interpretation of the work preservation provision that would force APL to enter into an illegal agreement with Samson or force it to cease doing business with Samson.  The court dismissed the complaint after concluding that APL lacked the requisite standing.  On appeal, the Ninth Circuit reversed and remanded the case back for determination on the merits.  On remand, the ILWU filed its motion for summary judgment.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[17]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[18]  However, summary

---

[12]Doc. 96-15.

[13]Doc. 91 at p. 168 (Ex. K).

[14]Doc. 91 at p. 173 (Ex. L).

[15]29 U.S.C. § 187.

[16]Fed. R. Civ. P. 56(a).

[17]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[18]*Id.*

judgment is mandated under Rule 56(c) "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[19]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[20] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[21] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[22] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[23] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[24]

## IV. DISCUSSION

APL brings suit against the ILWU pursuant to section 303 of the LMRA[25] to recover damages stemming from the arbitration instigated by ILWU, which APL alleges was an illegal unfair labor practice under sections 8(b)(4)(ii)(A) and (B) of the NLRA.[26]

---

[19]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[20]*Id.* at 323.

[21]*Id.* at 323-25.

[22]*Anderson,* 477 U.S. at 248-49.

[23]*Id.* at 255.

[24]*Id.* at 248-49.

[25]29 U.S.C. § 187.

[26]29 U.S.C. § 158(b)(4)(ii)(A), (B).

-6-

Both subsections (A) and (B) prohibit union coercion.  Subsection (A) prohibits coercing an employer to enter into an agreement which is prohibited by section 8(e) of the NLRA.[27]  Section 8(e) prohibits "hot cargo" agreements, which are agreements where a union and an employer agree that the employer will not handle the goods of another or will cease doing business with another person and include "union signatory" agreements that prohibit an employer from subcontracting with any business who does not use union labor.[28]  Subsection (B) prohibits coercing any employer to cease doing business with another party, regardless of any agreement.[29]

A union's actions will not be deemed coercive under section 8(b)(4) if the purpose of those actions are aimed at preserving work for its employees in the bargaining unit (primary union activity), rather than accomplishing union goals elsewhere (secondary union activity).[30]  Secondary union activity includes disrupting business relations of a non-union employer or expanding the reach of the union to claim work not traditionally performed by bargaining unit members.[31]  The relevant inquiry is whether the union's efforts are directed at matters involving the labor relations of the contracting employer vis-a-vis his own employees.[32]

A union's pursuance of a grievance through arbitration can be considered coercive under section 8(b)(4) if that grievance is based on an interpretation of a

---

[27]29 U.S.C. § 158(b)(4)(ii)(A).

[28]29 U.S.C. § 158(e); *see also Am. President Lines, Ltd. v. Int'l Longshore and Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1152 n.3 (9th Cir. 2013).

[29]29 § 158(b)(4)(ii)(B).

[30]*NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO ("ILA II")*, 473 U.S. 61, 74-76,78-79 (1985).

[31]*Id.* at 81.

[32]*NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO ("ILA I")*, 447 U.S. 490, 504 (1980).

collective bargaining agreement that furthers an unlawful object.[33]  That is, it is coercive

if a union pursues an interpretation of a collective bargaining agreement in arbitration

that promotes secondary union activity and not primary work preservation activity.  The

court applies a two-part test when determining whether an agreement is a lawful work

preservation agreement: (1) the union's objective must be the preservation of work

traditionally performed by employees represented by the union; and (2) the contracting

employer must have the power to give the employees the work in question.[34]

Here, APL argues that ILWU's interpretation of the AALA—that requires APL to

use ILWU labor in Seward for cargo handling—is an unlawful one because it

necessarily results in a de facto union signatory requirement for Samson or forces APL

to cease doing business with Samson.  The ILWU asserts that its interpretation of the

AALA work preservation provision is a lawful prohibition on employers from

subcontracting outside the bargaining unit, which is a broadly defined unit consisting of

all ILWU represented longshore workers in a multi-port area used by the multiple

employers who are parties to the AALA.

The ILWU's interpretation of its contract rights is colorable given case law

applicable to collective bargaining agreements involving multi-employer, multi-port

longshore work.  Specifically, *Bermuda Container Lines Ltd. v. International

Longshoremen's Association*,[35] provides support for ILWU's contention that multi-

employer, master collective bargaining agreements in the longshore industry that

prohibit carriers from subcontracting outside the bargaining unit can be lawful if the

primary objective of the prohibition is work preservation for the bargaining unit

employees, even if the incidental effect is that an employer must cease doing business

---

[33]*See Nelson v. Int'l Bhd. of Elec. Workers, Local Union No. 46*, 899 F.2d 1557, 1562 (9th Cir. 1990), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *Truck Drivers, Union Local 705 v. NLRB*, 820 F.2d 448, 452 (D.C. Cir. 1987).

[34]*ILA I*, 447 U.S. at 504.

[35]192 F.3d 250 (2d Cir. 1999).

with other entities.  In *Bermuda*, Bermuda Container Lines ("BCL"), a marine carrier like APL, was a party to an East and Gulf Coast-wide master collective bargaining agreement with a longshore union, the ILA.  BCL shipped cargo between Bermuda and the Port of New York on a daily basis.  The master agreement contained a provision that sought to preserve certain longshore work for union members.  BCL had subcontracted with Maher Terminals, a stevedore company also bound to the master agreement with the ILA, for dock work at the Port of New York, but then sought to relocate from the Port of New York to the port in Salem, New Jersey, where non-ILA workers were employed.  The ILA union filed a grievance alleging that BCL's move to Salem violated the master agreement by diverting work away from ILA union members. The grievance was sustained, and BCL was required to pay damages for each shipping container that non-ILA workers handled in Salem.  BCL filed suit to challenge the arbitration award, arguing that the agreement as interpreted by the arbitrator required it to refrain from doing business with companies in Salem or required those companies to hire union workers.

The Second Circuit found that the agreement was not an unlawful union signatory requirement, concluding that it lawfully prohibited subcontracting outside the bargaining unit in order to preserve work for the bargaining unit employees.[36]  In so holding, it rejected BCL's argument that the appropriate bargaining unit would only encompass those ILA union employees who did work for BCL through Maher Terminals at the Port of New York and that the union's grievance challenging its move to Salem was aimed at expanding the union's reach to Salem and not preserving ILA union work in the Port of New York.[37]  Instead, the court stressed that BCL was party to an industry-wide collective agreement, where the relevant bargaining unit was defined on a multi-employer, multiple-port basis, and thus the bargaining unit employees were all the

---

[36]*Id.* at 256-57.

[37]*Id.* at 257.

-9-

longshore workers represented by ILA on a coast-wide basis.[38]  BCL was therefore
required to preserve work for all ILA union members on a coast-wide basis and the use
of non-ILA workers in Salem would directly hurt existing members of the bargaining unit
by reducing the number of jobs available in the relevant geographic area.[39]

Based on *Bermuda*, an agreement that prohibits subcontracting outside the
bargaining unit by requiring contracting employers to hire bargaining unit employees
either directly or indirectly through other signatory employers can be a lawful work
preservation agreement in situations like here, where the bargaining unit consists of a
multi-port, multi-employer pool of longshore workers.  Indeed, APL concedes that a
union contract can lawfully preclude subcontracting.  It argues, however, that here
ILWU's interpretation is not an outright prohibition on subcontracting but instead is a
prohibition on subcontracting based on union membership.  It argues that limitations on
who can be subcontractors are only lawful if those limitations are directed at economic
standards and not union affiliation.  APL incorrectly focuses on itself as the relevant
employer rather than the collective group of employers under the AALA when arguing
that the ILWU limits its ability to subcontract based on union affiliation.  The primary
employer here is not just APL; it is collectively all employers subject to the AALA.  The
ILWU's interpretation of the AALA amounts to a prohibition, directed at the primary
employers collectively, on subcontracting out work covered under the AALA.  The fact
that this means APL might be forced to use other signatories to the AALA as
subcontractors if they do not directly hire ILWU workers in Seward is a consequence of
APL's status as a signatory to a multi-employer collective bargaining agreement.

Thus, the court concludes that the interpretation of the AALA sought by the
ILWU was not clearly unlawful: it did not necessarily amount to a hot cargo or union
signatory agreement.  The remaining issue is whether the ILWU's interpretation of the

---

[38] *Id.*

[39] *Id.*

-10-

AALA can be considered a lawful work preservation agreement as applied to the work in question. As noted above, the court must consider whether the cargo-handling work in Seward was fairly claimable by the ILWU and whether APL has control over the work in question.[40]

The Alaska Arbitrator made findings of fact that resolve these two issues when he considered whether APL was in violation of the AALA. He found that ILWU workers had previously performed the disputed cargo-handling work in Seward and that APL had the right to control the assignment of its cargo-handling work.[41] As instructed by the Ninth Circuit, the court must decide whether and how much to defer to the Arbitrator's findings of fact.[42]

APL argues that the court cannot defer to the Alaska Arbitrator's findings of fact because it is not challenging the Alaska Arbitrator's decision regarding the contract under section 301 of the LMRA but, rather, is challenging the union's conduct under section 303. It argues that the limited judicial review and deference required under section 301 has not been extended to section 303. It cites to *Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees Local 584*,[43] where the Second Circuit stated that the strong policy favoring arbitration and deference to an arbitrator's findings related to collective bargaining agreements does not have equal force in suits arising under section 303 where the dispute is concerned with an employer's right to recover damages caused by an unfair labor practice, "which is entirely separate from any right conferred on him by section 301."[44]

---

[40]*ILA I*, 447 U.S. at 504.

[41]Doc. 91 at pp. 111-120; Doc. 91 at p.149; Doc. 91 at pp. 155-56.

[42]721 F.3d at 1557 n.7.

[43]359 F.2d 598 (2d Cir. 1966).

[44]*Id.* at 602-03.

While this dispute was brought pursuant to section 303, APL's claim for damages is not entirely separate from the underlying contract claim that was the subject of the arbitration.  APL's claim for damages arose from the ILWU's prosecution of contract grievances, and APL argues that ILWU advanced an unlawful interpretation of the applicable contract when pursuing arbitration against it.  Thus, APL's section 303 claim directly and inextricably involves the contract issues decided by the Alaska Arbitrator.  The court agrees with the ILWU that the Alaska Arbitrator's findings related to whether the work sought had been performed by ILWU workers and to whether APL controls the work, the critical facts in this case, should be given significant weight given the fact that he is intimately familiar with the longshore industry.

Even disregarding the Alaska Arbitrator's findings, the court concludes that the agreement as construed by the ILWU has a lawful work preservation purpose given the undisputed evidence on the record.  When looking at the nature of the work involved, the focus is on the work of the bargaining unit employees.[45]  Here, the bargaining unit employees include all longshore workers represented by the ILWU doing work at certain Alaska ports for multi-employers under the AALA.  It is undisputed that bargaining unit employees have performed cargo-handling work in covered Alaska ports, including Seward, pursuant to the AALA.  North Star hired ILWU to perform such work in Seward prior to 2003.  North Star was and is an employer bound by the AALA. Thus, the ILWU has handled cargo in Seward under the AALA in the past.  The work is fairly claimable.

APL argues that the work is not fairly claimable because the work done by the ILWU in Seward was not on behalf of APL.  This court agrees with the NLRB General Counsel in that it is irrelevant whether or not the work was performed for APL specifically.[46]  Again, the court must look to the work done by the bargaining unit

---

[45]*ILA I*, 447 U.S. at 507.

[46]Doc. 91 (Ex. L).

-12-

employees as a whole and not with reference to the particular employment practices of an individual employer. As noted above, the bargaining unit here is defined not just in terms of the employees of one employer, but in terms of employees doing work for multiple employers bound by the terms of AALA and functioning collectively as the primary employer. It is clear to this court, as it was to the Alaska Arbitrator and the NLRB, that the ILWU has historically performed such cargo-handling work under the AALA, even in Seward.

APL appears to find it significant that North Star is only an individual signatory to the AALA and is no longer a part of the AMEA, the organization that negotiates the collective bargaining agreement on behalf of APL. Even if the bargaining unit employees should be narrowed to those ILWU members doing work for the AMEA employers, at the time North Star used ILWU labor to do loading and unloading work in Seward it was, in fact, a member of AMEA along with APL.

Not only is the disputed loading work in Seward fairly claimable by the ILWU, APL has the right to assign such work to the ILWU. As noted by the ILWU in its briefing, the evidence shows that APL "controls where APL's containers go, when they go, where they go, when they get there, and who takes them."[47] The evidence also shows that the reason APL did not have ILWU workers handle its cargo in Seward and agreed to let Samson's non-ILWU workforce do the work instead is because they wanted to avoid a jurisdictional issue with Samson's MEBA-represented workforce.[48] It is undisputed that the MEBA ended up disclaiming the Seward work.[49] APL's current practices demonstrate that it could have the ILWU handle its cargo when at port, even though the cargo is transported by Samson barges. Samson barges deliver APL customers' cargo from the smaller ports, including Seward, to Dutch Harbor. Dutch

---

[47]Doc. 91 at p. 134 (Ex. D at p. 6).

[48]Doc. 91 at p. 139 (Ex. D at p. 11).

[49]Doc. 91 (Ex. F).

-13-

Harbor is another port covered by the AALA, and APL chooses to employ ILWU longshore workers from the joint dispatch halls to do its cargo-handling work on the incoming and outgoing Samson barges in Dutch Harbor. This practice demonstrates that APL can have Samson, its contractor, agree to this type of arrangement in Seward or otherwise arrange for ILWU labor to perform such work.

Given that the cargo-handling work in Seward is fairly claimable by the ILWU and that APL has the power to assign such work to ILWU workers, the interpretation of the AALA advanced by the ILWU and adopted by the Alaska Arbitrator is a lawful work preservation interpretation, and thus, there is no violation of section 8(b)(4)(ii). APL's section 303 claim fails as a matter of law.

## V. CONCLUSION

Based on the preceding discussion, Defendant's motion for summary judgment at docket 88 is GRANTED. The Clerk of Court will please enter judgment for the defendant.

DATED this 18th day of February 2014,

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE
